## HUDSON v. PITTSBURGH PLATE GLASS CO.

(District Court, W. D. Pennsylvania. May Term, 1911.)

No. 4.

1. WHARVES ⟨⤳⟩20 (3, 5)—OWNER OF BERTH AND OF VESSEL BOTH IN FAULT FOR INJURY OF STEAMER.

Owner of a harbor berth, in which it had dumped cinders, forming a dangerous ridge under water, and which rented the berth for mooring a steamer during the winter without warning of the danger, and the owner of the boat, who if he did not know of the ridge could have discovered it by ordinary care, both *held* in fault, and liable for loss of the boat by being broken on the ridge, where it was forced by high water and held by ice until the water sank.

2. WHARVES ⟨⤳⟩20 (7)—MEASURE OF VALUE OF STEAMER FIXED BY ALLOWING FOR ANNUAL DEPRECIATION.

The value of a steamer, which was sunk at a wharf, with total loss, where the evidence was conflicting, fixed by deducting from her original cost 10 per cent. each year for depreciation.

In Admiralty. Suit by H. P. Hudson, owner of the steamboat Florence Belle, against the Pittsburgh Plate Glass Company. Decree dividing damages.

Lowrie C. Barton, of Pittsburgh, Pa., for libelant.

Gordon & Smith, of Pittsburgh, Pa., for respondent.

YOUNG, District Judge. The libel in this case was filed by H. P. Hudson, the owner of the steamboat Florence Belle, to recover damages for the alleged negligence of the Pittsburgh Plate Glass Company, the respondent, causing the loss of the steamboat. It appears from the evidence that the Florence Belle was owned by H. P. Hudson, the libelant, and was a stern-wheel towboat of over 50 tons, and that on the 14th day of December, 1909, she was placed by her owner, with the help of her officers and crew, in the harbor of the Pittsburgh Plate Glass Company at Creighton, on the Allegheny river, within this district, for harborage during the coming winter, and that within a few days she was forced by the ice and rising river from her moorings and towards the shore, and the river afterwards falling, and she being held by the ice, was cut down by the ice, or broken upon the bank, and damaged, so that she was almost an entire loss.

[1] The important disputed questions of fact in the case arise upon the following inquiries: First, what was the condition of the bank or shore of the river at the mooring place of the Florence Belle, and was it the proximate cause of the destruction of the boat? Second, was the Florence Belle moored in the harbor in the place designated by the respondent or its agents, or was she moored in a place selected by the owner, without instructions from or direction by the respondent? Third, if the Florence Belle was moored at a direction by the respondent or its agents, did the respondent or its agents know that the place was unsafe, because of the cinder pile, and was it not the duty of the respondent to warn the owner of the

⟨⤳⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes·

dangers of the place, and did not the respondent thereby at least contribute to the injury, and become liable for at least a portion of the damages caused by the destruction of the boat?

As to the first inquiry: The evidence in this case clearly shows that the respondent, prior to 1890, had constructed and maintained a harbor at Creighton, in the Allegheny river, which has been continuously used by it for its own craft and by the owners of other craft as a place for anchorage, and that the libelant, as the owner of the Florence Belle, had permission from the respondent on the 14th day of December, 1909, to moor his boat in that harbor under the implied promise to pay for such harborage. The evidence also establishes the fact that the United States government has established at this harbor a harbor line, the surveys for which were made prior to the time of the accident, but the harbor line was not established until the latter part of 1910, almost a year after the accident, and that the respondent deposited on the bank of the river refuse in the form of cinders, and that the same was between high and low water mark prior to the establishment of the harbor line, but landward of the established harbor line, and that the said deposits caused a high artificial bank, which had a natural slope down to and into the water at pool full, the actual low-water mark of the river, and that such artificial bank was of such size and shape that a boat floating above it would, after the water receded, be stranded upon the cinder pile, without support at prow and stern, but only in the middle, and would therefore be broken. Having, then, ascertained the condition of the place where the boat was moored, was that condition a proximate cause of the destruction of the boat?

The evidence clearly establishes that, had the cinder pile not been there, the action of the ice and the rising river would have carried the boat landward, and that, when the water receded, the boat, being still held by the ice, would have settled down on the natural beach or shore, where it would have had support for its entire length, but that the presence of the cinder pile prevented the boat from being pushed shoreward over a comparatively level shore, and that the final settling or stranding of the boat was upon the cinder pile, which was of such size, slope, and shape as to give no support to the boat at its extremities, but only in its middle part. We must therefore determine whether the boat was cut down and destroyed by the ice and the loss so resulted, or whether the ice was only the means of moving the boat to a dangerous place over the bank, and the loss of the boat caused by its stranding upon the cinder pile. After a careful consideration of the evidence, we are forced to the conclusion that we cannot attribute the destruction of the boat entirely to the action of the ice or to the stranding upon the cinder pile.

We think these two concurrent causes equally contributed to the result. We regard the rising of the river and the action of the ice as natural causes, which are to be expected by those navigating the rivers, and as the evidence in this case shows both these natural causes would not have resulted in the destruction of the boat, had not the cinder pile prevented the boat from being pushed landward while the river

was rising, and the action of the ice equally prevented the boat from floating back to the river with the receding water. The causes, therefore, of the destruction of the boat, were the joint, concurrent, and equally contributing causes of the water, the ice, and the cinder pile, which cannot be separated from each other, and the exact force and effect of each of these causes accurately measured. We regard the presence of the cinder pile, the expected rising of the river, and the expected action of the ice as together making the place of mooring a dangerous place. This disposes of the first inquiry, and brings us to a consideration of the second.

Was the Florence Belle moored in the harbor at a place designated by the respondent or its agents, or was the place selected by the owner of the boat without instruction from or direction by the respondent? The evidence establishes that the owner of the boat found himself without safe harborage and exposed to danger by the freezing of the river on December 13, 1909, and that he obtained permission from the respondent to place his boat in its harbor, and on the 14th of December, 1909, brought his boat himself with the help of the officers and crew to the respondent's harbor. The evidence clearly satisfies us that there were other and safer places in the harbor for the boat to remain during the winter; but the place where the boat was moored was either selected by the owner or by the respondent's agents. The burden of proof that the boat was placed by direction of the respondent was upon the libelant, and after a careful consideration of all the evidence we are not satisfied that the libelant has carried this burden. While it was not alleged in the libel at all that the respondent directed the libelant where to place his boat, the libelant undertook to establish that fact, and much testimony was submitted on both sides of the question; but a thorough examination of that evidence fails to establish that fact. We therefore conclude that libelant selected the place where he himself moored his boat and received no instruction or direction from respondent as to where to place it. This disposes of the second inquiry, and brings us to the third.

Even though the libelant made the selection of the place where the boat was moored, if the respondent had knowledge of the dangers of the place and they were unknown to libelant, its duty was to warn libelant of such dangers, and a failure to do so would make respondent responsible in damages. Much evidence was submitted by libelant to establish the dangers of the place, the want of knowledge by libelant of such dangers, the knowledge by respondent of the dangers, and its failure to warn libelant. The burden of proving all these allegations was upon the libelant, and they were alleged in the libel as the acts of negligence on the part of respondent and to which libelant attributed the loss of his boat. The evidence establishes that the employés and agents of respondent knew of the presence of the cinder pile; knew that the rising of the river and the action of the ice would cause a vessel moored opposite the cinder pile to be pushed landward, so as to be above the slope of the cinder pile; knew that if the ice held the boat, and the water receded,

the boat would be broken; and, knowing these things, knew thereby that the place where the Florence Belle was anchored was a dangerous place at which to moor a boat during the winter season, and these conditions and the probable danger were known to the respondent and its employés and agents, who were present when the Florence Belle was placed in the harbor.

The evidence also establishes that the owner of the boat, H. P. Hudson, who was on the boat when it was placed, had a thorough knowledge of the Allegheny river, knew of the general conditions of the harbor, saw or could have seen by the use of his eyes that there was a cinder pile opposite to where he was placing his boat, knew that the cinder pile continued under the water, knew that the action of the ice and the rising of the river would carry his boat above the slope of the cinder pile, and that the receding water, if the boat was held by the ice, would leave the boat stranded on the cinder pile, and unsupported except in the middle part—in short, knew or ought to have known all the dangers of the place at which he was mooring his boat, as well as the respondent.

These, then, being the facts established by the evidence, it only remains to apply the proper rule of law. We conclude, as matters of law applicable to this case, first, that while the duty to warn the libelant of the dangers of the place rested upon respondent, its failure to so warn the libelant cannot be charged against the respondent for the full amount of the loss, because the dangers of the place, as shown by the evidence, were equally as well known to the libelant as to the respondent; second, the libelant having been shown, under the evidence, to have had a knowledge of the dangers of the place, or the dangers being so apparent and obvious that he should have known them, he thereby assumed the risk of the place.

It thus appearing from the foregoing discussion that the loss of the Florence Belle was occasioned by the joint, concurrent, contributing causes of the ice, water, and cinder pile, and that both libelant and respondent had knowledge that the place was dangerous because of these conditions, and were therefore equally guilty of negligence, the libelant in taking a place he knew to be dangerous, and the respondent in maintaining a dangerous place in its harbor and permitting libelant to moor his vessel there, we are of opinion that the moiety rule should be applied. The authorities are abundant that this rule applies in admiralty. The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29, 34 L. Ed. 586, and cases there cited. There is no fixed rule as to an equal division of the damages; the proportion of division being decided by the facts of each particular case. In this case it is impossible to fix or measure the proportion of loss resulting from the negligence of each, and therefore we are of opinion that the damages and costs should be equally divided.

[2] What, then, are the damages proved? The burden of proving these damages was on the libelant. The boat was an entire loss. What was the value of the boat at the time of its loss, December 22, 1909? Much evidence has been submitted on both sides of this question. The libelant claims the value of the boat was $10,000. The re-

spondent, on the other hand, claims that the value was not more than $4,807. We are of opinion, under the conflicting evidence in this case, that the only safe rule to follow is that laid down in the J. E. Trudeau, 54 Fed. 907, 4 C. C. A. 657. The libelant has testified that the Florence Belle was built in 1895, at a cost of $21,000. This evidence is not contradicted. Taking this, then, for the basis of the calculation, and allowing a 10 per cent. depreciation per year, we would arrive at a value in December, 1909, of $4,807. We are therefore of opinion that the Florence Belle at the time of her destruction was of the value of $4,807, and that libelant is entitled to recover one-half of that amount, or the sum of $2,403.50, with interest at the rate of 6 per cent. from December 22, 1909, to the present time, and that the costs of the case should be divided.

Having found all the facts necessary to a decision of this case, we decline to answer the respective requests of libelant and respondent for facts and law.

Let a decree be drawn in accordance with this opinion.